Frank CLEMENT, Plaintiff,

v.

**CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., Defendants.**

No. C 00–1860 CW.

United States District Court, N.D. California.

Sept. 9, 2002.

Frank Clement, Crescent City, CA, pro se.

Ann Brick, American Civil Liberties Union Foundation of Northern CA Inc., Robert A. Mittelstaedt, Jennifer Starks, Pillsbury Winthrop LLP, San Francisco, CA, Donald Specter, Heather MacKay, Prison Law Office, San Quentin, CA, J. Bryce Kenny, Russell J. Clanton & Associates, Arcata, CA, for plaintiff.

Linda Pancho, Elizabeth S. Kim, CA State Attorney General's Office, San Francisco, CA, for defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; GRANTING PLAINTIFF PARTIAL SUMMARY JUDGMENT.

WILKEN, District Judge.

Defendant California Department of Corrections (CDC) and the named Defendant employees of the CDC (Individual Defendants) move for summary judgment on Plaintiff Frank Clement's section 1983 claims for damages and injunctive relief. Plaintiff opposes the motion and moves for preliminary injunctive relief with respect to one of his claims. Defendants oppose Plaintiff's request for a preliminary injunction. The matter was heard on August 9, 2002. Having considered all of the papers filed by the parties and oral argument on the motion, the Court grants in part and denies in part Defendants' motion for summary judgment (Docket # 31), denies Plaintiff's request for a preliminary injunction (Docket # 53), and grants partial summary judgment to Plaintiff.

## BACKGROUND

At all times relevant to this motion, Plaintiff was a prisoner at Pelican Bay State Prison (Pelican Bay).

### A. Delay in Diagnosis and Treatment for Colon Cancer

On April 8, 1999, Plaintiff advised a nurse that he had been experiencing intermittent episodes of diarrhea, with blood and mucus in watery, loose stool. She arranged for him to see a doctor the next day. Declaration of Dwight Winslow (Winslow Dec.), Ex. A. Plaintiff was examined by a doctor at Pelican Bay on April 9, 1999. The doctor ordered a barium enema and ordered that a stool sample be tested.

The doctor advised Plaintiff to return in two weeks for follow up. *Id.*, Ex. B. Plaintiff returned to Pelican Bay clinic on April 12 complaining that his symptoms had worsened. He was taken to Sutter Coast Hospital that day. *Id.*, Ex. C. At Sutter Coast Hospital, Plaintiff's abdomen was x-rayed and he was evaluated by Dr. Picone. Dr. Picone recommended that Plaintiff be put on a bland diet and be scheduled for a colonoscopy.[1] *Id.*, Ex. D–E.

The results of the barium enema became available on April 13, 1999. They showed the presence of one small polyp, two small polypoid lesions, and several small scattered diverticula in the sigmoid colon. *Id.*, Ex. F. On April 25, Pelican Bay medical administrative review staff approved the colonoscopy as well as an esophagogastroduodenoscopy (EGD).[2]

Plaintiff saw Dr. White at the Pelican Bay Clinic on May 11, 1999 and on May 26, 1999. Dr. White noted that Plaintiff had lost fourteen pounds in the two weeks between visits. Declaration of Frank Clement (Clement Dec.), Exs. 8–9. On May 21, 1999, Plaintiff saw Dr. Picone at Sutter Coast Hospital. Dr. Picone again recommended a colonoscopy. *Id.*, Ex. H. On June 9, 1999, Plaintiff saw Dr. White at the Pelican Bay clinic. Dr. White's notes from that visit indicate that she contacted Dr. Picone's office and was told that Plaintiff's colonoscopy appointment was "pending." *Id.*, Ex. N. On June 22, 1999, Plaintiff returned to the Pelican Bay clinic and again saw Dr. White. Dr. White's notes from that meeting indicate that she again contacted Dr. Picone's office and was told that Plaintiff's surgery would be scheduled. *Id.*, Ex. P. On June 24, 1999, Dr. Picone issued an addendum to his April 12, 1999 patient note. The addendum indicates that Plaintiff had been scheduled for a colonoscopy (though it does not say when), but that a "physical problem at the hospital prevent[ed] surgery on that day." *Id.*, Ex. Q.

On July 16, 1999, Plaintiff was taken to Sutter Coast Hospital to have the colonoscopy and the EGD performed. Only the EGD was performed on that day. *Id.*, Ex. R. The parties dispute why the colonoscopy was not performed on July 16. Plaintiff contends that Defendants had not given him medication necessary to prepare him for the procedure. Declaration of Frank Clement (Clement Dec.) ¶ 5. Defendants contend that there was a "technical problem" at the hospital that prevented the hospital from performing the procedure. Winslow Dec., Ex. R.

On July 20, 1999, Plaintiff filed an administrative appeal (602 appeal) because the colonoscopy had not yet been performed. On August 2, 1999, a colonoscopy was performed on Plaintiff and two polyps were removed. *Id.*, Ex. V. The pathology report on the removed polyps revealed that one was benign and the other malignant. *Id.*, Ex. W. The type of carcinoma revealed by the biopsy is a slow growing, non-invasive malignancy. *Id.* ¶ 29.

On August 13, 1999, Plaintiff saw Dr. Picone to follow up on the surgery. Dr. Picone recommended that Plaintiff return for another colonoscopy in six months and that Plaintiff be put on a high fiber, low-fat diet with no red meat. *Id.*, Ex. X. Defendant Winslow, the Chief Medical Officer at Pelican Bay, does not believe that a red meat free diet is medically necessary for Plaintiff. *Id.* ¶ 32. Plaintiff was not immediately put on the specified diet. On August 25, 1999, Plaintiff filed a 602 appeal

---

1. A colonoscopy is a visual examination of the inner surface of the colon by means of a colonoscope. Stedman's Medical Dictionary at 367 (26th ed.1995).

2. An EGD is an endoscopic examination of the esophagus, stomach and duodenum. *Id.* at 598.

complaining that he was not receiving the diet ordered by Dr. Picone. Clement Dec., Ex. 14. On October 17, 1999, Plaintiff's low-fat diet was commenced, but Defendants continued to include red meat in his diet. Clement Dec. ¶ 13. On December 21, 1999, Plaintiff began to receive a second sack lunch along with his low-fat diet so that he could substitute the meat portion of his meal without sacrificing his caloric or nutritional intake. Winslow Dec. ¶ 33.

### B. Tennis Shoes

Plaintiff has calcaneal bone spurs. Plaintiff contends that because of this condition, the Pelican Bay—issued shoes cut into the back of his heels, making walking and exercise uncomfortable and resulting in blisters on his heels. Clement Dec. ¶ 19. Plaintiff contends that he has a medical need for tennis shoes from a vendor other than the one approved by the facility. Although his treating physician has authorized such purchases, that physician was overruled by Pelican Bay's Health Care Manager. Clement Dec. ¶ 34. Plaintiff appealed the Health Care Manager's decision through Pelican Bay's administrative system. The decision not to permit Plaintiff to purchase tennis shoes from an outside vendor was upheld on appeal. *Id.* ¶¶ 34, 42

On March 8, 2001, Plaintiff filed a petition for a writ of habeas corpus in State court seeking an order allowing him to purchase tennis shoes from an outside vendor. That writ was denied on August 20, 2001 on the grounds that "a difference of opinion among staff does not constitute deliberate indifference to petitioner's medical needs." Declaration of Julianne Mossler (Mossler Dec.), Ex. D (Order Denying Petition for Writ of Habeas Corpus and Discharging Order to Show Cause).

### C. Receipt of Internet Materials

In 1998, Pelican Bay adopted a policy that materials printed from the Internet were considered "unauthorized publications" and could not be enclosed in letters sent to prisoners from the outside. The prison changed this policy several times over the next two years and the most recent version was formalized in a memo from the Warden in February, 2001. Declaration of Deirdre K. Mulligan (Mulligan Dec.), Ex. C.

Pelican Bay prisoners do not have access to the Internet. Prisoners, therefore, cannot directly access materials on-line. Pelican Bay's policy bans prisoners from receiving through the mail hard copies of material downloaded from the Internet.

Plaintiff filed an inmate grievance contesting this policy in January, 1999 when his pen-pal correspondence was returned to the sender due to the new policy. Plaintiff had subscribed to an Internet pen-pal service which allows a prisoner to post a web page and solicit correspondence. Those who would like to communicate with the inmate may send an e-mail to the prisoner's web page. The service provider then downloads the e-mail and sends it via the United States Postal Service to the inmate. On January 10, 1999 and April 6, 1999, the prison mailroom rejected letters sent by the Internet service to Plaintiff because they contained messages downloaded from the Internet. Plaintiff filed a grievance which was ultimately denied by prison authorities.

Like Pelican Bay, at least eight other prisons in California also prohibit prisoners from receiving any items downloaded from the Internet. Mulligan Dec. ¶ 6–8. Presently, the majority of California State prisons have no such regulation.

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Eisenberg,* 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *Id.; see also Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1409 (9th Cir.1991), *cert. denied,* 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan,* 929 F.2d at 1409. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

If one party moves for summary judgment and it appears from the oral arguments, records, affidavits, and documents presented to the Court that there is no genuine dispute regarding material facts essential to the movant's case, and that the case cannot be proved at trial, the Court may sua sponte grant summary judgment in favor of the non-moving party. *Portsmouth Square, Inc. v. Shareholders Protective Comm.,* 770 F.2d 866 (9th Cir.1985) (citing *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311–12 (9th Cir.1982)). The fundamental issue is whether the party against whom summary judgment is rendered had a full and fair opportunity to ventilate the issues involved in the motion. *See Cool Fuel,* 685 F.2d at 312.

### B. Section 1983

■ Title 42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (quoting 42 U.S.C.

§ 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *See Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of State law. *See West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Ketchum v. Alameda County*, 811 F.2d 1243, 1245 (9th Cir.1987).

### 1. Eighth Amendment Claims

■ A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *see Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, *see id.* (citing *Wilson*, 501 U.S. at 297, 111 S.Ct. 2321).

■ In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it can be withheld. *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir.2000). Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim. *See id.* at 732–733;

■ The requisite state of mind to establish an Eighth Amendment violation depends on the nature of the claim. In prison-conditions cases, the necessary state of mind is one of "deliberate indifference." *See, e.g., Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (inmate safety); *Helling*, 509 U.S. at 32–33, 113 S.Ct. 2475 (inmate health); *Wilson*, 501 U.S. at 302–03, 111 S.Ct. 2321 (general conditions of confinement); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (inmate health). Neither negligence nor gross negligence will constitute deliberate indifference. *See Farmer*, 511 U.S. at 835–36 & n. 4, 114 S.Ct. 1970; *see also Estelle*, 429 U.S. at 106, 97 S.Ct. 285 (establishing that deliberate indifference requires more than negligence).

### 2. First Amendment Claim

■ Prison regulations that infringe a prisoner's constitutional right are valid so long as they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). But the legitimate penological interest may not be presumed. "[T]he [defendant] must, at the very least, adduce some penological reason for its policy at the relevant stage of the judicial proceedings. '[C]onsiderations advanced to support a restrictive policy [must] be ... sufficiently articulated to permit ... meaningful review.' Thus, at a minimum, the reasons must be urged in the district court." *Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir.2001) (quoting *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir.1990)).

### DISCUSSION

Plaintiff Frank Clement brings claims for damages and injunctive relief pursuant to 42 U.S.C. § 1983. He alleges three separate and distinct constitutional violations. First, he contends that Defendants violated the Eighth Amendment to the United States Constitution by delaying, denying and interfering with his medical treatment for colon cancer. Second, he alleges that Defendants violated his Eighth Amendment rights by refusing his medically necessary request for tennis

shoes. Third, he alleges that Defendants violated his First Amendment rights by prohibiting him from receiving materials generated on the Internet and mailed to him at Pelican Bay.

I. Diagnosis and Treatment

A. Exhaustion

The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e(a), requires a prisoner to exhaust such administrative remedies as are available before suing over prison conditions. Defendants contend that Plaintiff's claim for deliberate indifference to his medical needs with respect to the delay in receiving a colonoscopy and the delay in implementing a red meat free diet was not exhausted until after he filed this action. *See* Declaration of Linda L. Rianda (Rianda Dec.), Ex. B (Director's Level Appeal Decision on Plaintiff's request for a special meal).

 As noted above, Plaintiff filed two 602 appeals concerning the diagnosis and treatment of his colon cancer. The first was filed on July 20, 1999. That appeal requested that the colonoscopy ordered by his physician be performed. The colonoscopy was performed on August 2, 1999 and the appeal was "granted" on September 8, 1999. Clement Dec., Ex. 6. The second 602 appeal, relating to his special diet, was filed on September 16, 1999. On October 17, 1999 a special diet for Plaintiff was started and on December 21, 1999 that diet was modified to provide Plaintiff an extra sack lunch so that he could substitute the second lunch for the red meat contained in his "heart healthy diet." By December, 1999, therefore, Plaintiff had received all

the relief that the prison administrative appeal system could provide. Under these circumstances, Plaintiff was not required to exhaust further administrative appeals. *Gomez v. Winslow,* 177 F.Supp.2d 977, 985 (N.D.Cal.2001) ("Because [the plaintiff] had, in essence, 'won' his inmate appeal, it would be unreasonable to expect him to appeal that victory before he is allowed to file suit."). Plaintiff, therefore, adequately exhausted his administrative appeals as required by the PLRA.[3]

B. Deliberate Indifference to Serious Medical Needs

Plaintiff first brought his symptoms to Defendants' attention on April 8, 1999. A colonoscopy was recommended by his treating physician on April 12, 1999. The colonoscopy was not performed until August 2, 1999. Plaintiff contends that the delay in performing this procedure, which led to the discovery and removal of a malignant polyp, constitutes deliberate indifference to his medical needs.

 A prisoner who makes a claim of deliberate indifference to serious medical needs premised on delay must show that the delay resulted in substantial harm. *Wood v. Housewright,* 900 F.2d 1332, 1335 (1990). Plaintiff was diagnosed with carcinoma in situ, which is a slow growing, non-invasive malignancy. Winslow Dec. ¶ 29. Three colonoscopies performed on Plaintiff in the fourteen months after the removal of the malignant polyp have not detected any cancer. *Id.* ¶ 31, Ex. Y. Consequently, the evidence in the record indicates that Plaintiff has suffered no adverse effects from the three month delay in providing a colonoscopy.[4]

---

**3.** Defendants do not dispute that Plaintiff's Eighth Amendment claim relating to the provision of tennis shoes and his First Amendment claim concerning Internet materials were exhausted under the PLRA.

**4.** The fact that Plaintiff lost fourteen pounds while awaiting surgery is not a sufficient showing of harm because, after an initial period of weight loss, Plaintiff's weight stabilized. Moreover, Plaintiff has not presented evidence linking his weight loss to the delay in receiving the colonoscopy.

Plaintiff contends that he need not show harm caused by the delay because a "systemic delay" in the provision of medical care "may be constitutionally unacceptable" even absent a showing of serious harm. *Madrid v. Gomez*, 889 F.Supp. 1146, 1257 (N.D.Cal.1995). However, Plaintiff has not presented evidence that Defendants "regular[ly] and significant[ly] delay[ed]" the medical procedure. *Id.* The undisputed evidence in the record shows that the colonoscopy was initially delayed because of a problem at the hospital, not because of Defendants' actions. Winslow Dec., Exs. N, P, Q. Plaintiff contends that his procedure was subsequently rescheduled from July 16 to August 2 because of Defendants' actions. However, throughout the three month period during which Plaintiff waited to have the procedure performed, Defendants provided regular medical care, including multiple doctor visits, examination of stool samples, and a Kidney, Urinary and Bladder (KUB) x-ray. The regular provision of medical care throughout the summer of 1999 indicates that Plaintiff was not systemically denied medical treatment. Even assuming that Defendants caused the colonoscopy to be delayed from July 16 to August 2, a two week delay in providing the requested medical care is not a "regular and significant" delay sufficient to excuse Plaintiff from showing that the delay was harmful.

▮ In short, Plaintiff has not shown that the delay in diagnosing and treating his colon cancer was sufficiently harmful to support a claim for deliberate indifference against Defendants. Plaintiff has likewise failed to show harm from any delay in providing a medically appropriate diet. Plaintiff's treating physician recommended a high fiber, low fat diet free of red meat

on August 13, 1999. Pelican Bay's Chief Medical Officer determined that a diet completely free of red meat was not medically necessary. Winslow Dec. ¶ 32.[5] Plaintiff was given a high fiber, low-fat diet beginning on October 17, 1999. Beginning in December, 1999, Plaintiff's diet was supplemented with an extra sack lunch to permit him to substitute the meat portion of his meal without sacrificing caloric intake. Plaintiff appears to have abandoned his claim that the diet he is currently on reflects deliberate indifference to his medical needs. Rather, he argues that the delay in providing the diet is actionable. *See* Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Pl.Opp.) at 7–8. However, Plaintiff has not presented any evidence that he suffered any harm from the delay. Therefore, pursuant to *Wood*, 900 F.2d at 1335, Defendants are entitled to summary judgment on this claim of deliberate indifference to Plaintiff's serious medical needs

## II. Tennis Shoes

▮ A federal court must give State court judgments the same preclusive effect those judgments would have in State court. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Under California law, the doctrine of res judicata will prevent a party from relitigating a claim already decided on the merits if three conditions are met. *Panos v. Great Western Packing Co.*, 21 Cal.2d 636, 637, 134 P.2d 242 (1943). First, "the issues decided in the prior adjudication [were] identical to those presented in the later action." Second, "there was a final judgment on the merits in the prior action." Third, "the party against whom the plea is raised was

---

**5.** Plaintiff objects to, and moves to strike, paragraph thirty-two of the Winslow Declaration on the grounds that the declarant failed to set forth the reasoning underlying his opin-

ion that a diet free of red meat is not medically necessary. Plaintiff's objection goes to the weight of the evidence, not its admissibility. His objection is, therefore, overruled.

a party or was in privity with a party to the prior adjudication." *Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Ass'n*, 60 Cal.App.4th 1053, 1065, 71 Cal. Rptr.2d 77 (1998).

▮ The Ninth Circuit has applied the doctrine of res judicata in circumstances identical to those presented here. In *Silverton v. Department of the Treasury*, 644 F.2d 1341, 1347 (9th Cir.1981), the court gave preclusive effect to a State habeas decision in a subsequent section 1983 claim brought in federal court.

> In sum, we hold that because of the nature of a state habeas proceeding, a decision actually rendered should preclude an identical issue from being relitigated in a subsequent section 1983 action if the State habeas court afforded a full and fair opportunity for the issue to be heard and determined under federal standards.

In this case, Plaintiff brought the same claim concerning Defendants' refusal to permit him to order medically necessary tennis shoes in a habeas proceeding in State court. That claim was decided on the merits in August, 2001. Plaintiff does not dispute that he brings the same claim in the present action. He argues, however, that his claim is not barred because the State court decided his petition without an evidentiary hearing. Plaintiff cites no authority for the proposition that an evidentiary hearing is necessary before a final judgment may be given preclusive effect. And, in fact, the State court held that Plaintiff's claim of deliberate indifference failed as a matter of law. Thus, no evidentiary hearing was necessary. Consequently, Plaintiff raised the identical claim in a

prior adjudication and that decision precludes him from raising it again here.[6]

## III. Preliminary Injunction

Plaintiff has moved for preliminary injunctive relief requiring prison authorities to permit him to purchase shoes from a vendor of his choosing.

▮ To establish entitlement to a preliminary injunction, Plaintiff must demonstrate either a combination of probable success on the merits and the possibility of irreparable harm, or that there exist serious questions regarding the merits and the balance of hardships tips sharply in his favor. *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987); *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir.1985); *see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir.1975); *County of Alameda v. Weinberger*, 520 F.2d 344, 349 (9th Cir. 1975). Because Plaintiff's claim is barred by res judicata, he cannot show that serious questions regarding the merits exist and his motion for a preliminary injunction is denied (Docket # 53).

## IV. First Amendment Claim

▮ A prisoner's constitutional right to receive information by incoming mail is undisputed. *See e.g., Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir.2001). A prison regulation that impinges on this right is valid only if it is reasonably related to the prison's legitimate penological interests. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Four factors determine the reasonableness of the regulation.

---

**6.** Plaintiff also argues that the decision of the State court was not final because Plaintiff could have, but did not, appeal that decision. However, Plaintiff may not bootstrap his own failure to appeal a final judgment to circumvent the preclusive effect of that order.

*Plaine v. McCabe*, 797 F.2d 713, 719 n. 12 (9th Cir.1986) ("If an adequate opportunity for review is available, a losing party cannot obstruct the preclusive use of the state administrative decision simply by foregoing her right to appeal.").

First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it ...

A second factor relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates ...

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns.

*Id.* at 89–90, 107 S.Ct. 2254 (internal citations omitted).

The State must satisfy the first factor of the *Turner* test to succeed on this motion. That is, if the State cannot show a "valid, rational connection" between the policy at issue and a legitimate penological interest, the Court need not address the remaining factors. *See Prison Legal News*, 238 F.3d at 1151 ("Because the Department and its Officials have failed to show that the ban on standard mail is rationally related to a legitimate penological objective, we do not consider the other *Turner* factors.").

 The burden of proof in challenges to prison regulations is set forth in *Frost v. Symington*, 197 F.3d 348 (9th Cir.1999). The initial burden is on the State to put forth a "common-sense" connection between its policy and a legitimate penal interest. If the State does so, the plaintiff must present evidence that refutes the connection. *Id.* at 357. The State must then present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." *Id.*

## A. Rational Connection to Legitimate Penological Purpose

"All legitimate intrusive prison practices have basically three purposes: 'the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners.'" *United States v. Hearst*, 563 F.2d 1331, 1345 (9th Cir.1977) (citing *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) *rev'd on other grounds Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

With respect to the rehabilitation of prisoners, the Supreme Court has recognized that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Procunier*, 416 U.S. at 412–13, 94 S.Ct. 1800.

Constructive, wholesome contact with the community is a valuable therapeutic tool in the overall correctional process.... Correspondence with members of an inmate's family, close friends, associates and organizations is beneficial to the morale of all confined persons and may form the basis for good adjustment in the institution and the community.

*Id.* at 413 n. 13, 94 S.Ct. 1800 (quoting Policy Statement 7300.1A of the Federal Bureau of Prisons and Policy Guidelines for the Association of State Correctional Administrators).[7]

---

7. In striking down a restriction on the receipt of bulk rate mail, the Ninth Circuit also noted a "correlation between reading, writing and inmate rehabilitation." *Morrison v. Hall*, 261 F.3d 896, 904 n. 7 (9th Cir.2001) (citing Willoughby Mariano, Reading Books Behind Bars Reading Programs for State Prison Inmates and Juvenile Hall Wards are Critical to Helping Offenders Develop Literacy and

There are, in short, recognized rehabilitative benefits to permitting prisoners to receive educational reading material and maintain contact with the world outside the prison gates. Defendants nevertheless argue that the ban on all Internet-generated material is rationally related to maintaining safety and security in the prison. Defendants contend that Internet-generated information provides a particular danger to prison security because the potential high volume of e-mail, the relative anonymity of the sender, and the ability of senders easily to attach lengthy articles and other publications would greatly increase the risk that prohibited criminal communications would enter the prison undetected and would make tracing their source more difficult. *See In re Collins*, 86 Cal.App.4th 1176, 1184, 104 Cal.Rptr.2d 108 (2001) (upholding the regulation challenged here).[8]

Defendants' justification for the regulation rests on two premises. The first is that accepting mail that contains material downloaded from the Internet will substantially increase the quantum of mail sent to the facility and that regulating mail based on its origin is a rational approach to regulating excessive quantity. The second premise is that Internet-produced material has unique characteristics that make it susceptible to misuse. Specifically, Internet-produced material is more difficult to trace and facilitates transmission of hidden impermissible coded messages.

### 1. Volume Control

 In *Morrison v. Hall*, 261 F.3d 896 (9th Cir.2001), the plaintiff challenged a prison regulation that prohibited prisoners from receiving all bulk rate, third class and fourth class mail. Defendants argued that the regulation was rationally related to its legitimate need to "limit the total quantum of mail that enters the state prison system." *Id.* at 903. The court held that "prohibiting inmates from receiving mail based on the postage rate at which the mail was sent is an arbitrary means of achieving the goal of volume control." *Id.* at 903–04. Similarly, here, prohibiting all mail produced by a certain medium— downloaded from the Internet—is an equally arbitrary way to achieve a reduction in mail volume.

For the reasons identified by the Supreme Court and the Ninth Circuit and discussed above, any negative impact on prison resources created by a supposed increase in prison mail may be outweighed by the penological benefits of inmate correspondence with the outside world. The Court need not make such a determination here, however. If Pelican Bay officials believe that the safety and security of the prison is threatened by an increase in the quantity of mail, they have more direct means at their disposal to address that concern. Specifically, Defendants could limit the number of pages an inmate may receive in each piece of correspondence. Alternatively, they could regulate the number of pieces of correspondence received by each inmate. Because the prison may directly regulate the quantity of pages or the number of pieces of mail received by each prisoner, Defendants' policy of identifying an arbitrary substitute for volume and regulating that substitute lacks any rational basis.

---

Avoid Return to Crime, Experts Say, L.A. Times, Jan. 30, 2000, at B2).

**8.** Defendants have not presented any evidence to support their characterization of the effects of Internet-generated material on prison security. The absence of evidence, however, is not fatal to Defendants' motion. The Court's inquiry under *Turner* is not whether the policy actually serves a penological interest, but rather whether it was rational for prison officials to believe that it would. *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir.1999).

## 2. Susceptibility to Misuse

Defendants' second justification for the ban on Internet-produced material is that prohibited communication, such as coded criminal correspondence, is more easily hidden in such material and, moreover, such improper correspondence is harder to trace when found.

 Defendants have failed to articulate any reason to believe that Internet-produced materials are more likely to contain coded, criminal correspondence than photocopied or handwritten materials. Defendants state that "coded messages [can be] included in e-mail [and] cut and pasted into materials downloaded from the Internet that are not contained in e-mail; for example, in articles downloaded from a medical or legal web site." Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Defendants' Reply) at 8:8–9. There is no dispute, however, that the same information can be sent to prisoners at Pelican Bay if it is photocopied from a book, transcribed by hand, scanned, or produced in word-processed form. Defendants have failed to explain why criminal communications are less likely to be included through these permissible forms of correspondence.

Defendants have similarly failed to justify their belief that Internet communications that are sent to Pelican Bay are harder to trace than other, permitted communications. As noted, Pelican Bay prisoners do not have access to the Internet. The correspondence prohibited by the challenged regulation includes any information downloaded from the Internet and sent by regular mail to the facility. Consequently, the prohibited communications are just as likely as regular mail to have a postmark, or to contain fingerprint and DNA evidence. It is true that the author

of an e-mail may not provide his identity. However, this fact does not differentiate e-mail correspondence from anonymous typed missives. The evidence in the record suggests that Internet-produced materials are, in fact, easier to trace than anonymous letters because the major e-mail providers include a coded Internet Protocol address (IP address) in the header of every e-mail. Declaration of Mike Godwin (Godwin Dec.) ¶ 12. The IP address allows the recipient of an e-mail to identify the sender by contacting the service provider. *Id.* at ¶ 13. There are, of course, means available to disguise the origin of an e-mail message. *See* Declaration of Heather Mackay (Mackay Dec.), Ex. A (Transcript of Proceedings in *Collins v. Ayers*, No. 98–273–X (June 8, 1999)) at 48–9. The relevant question here, however, is whether e-mail and other Internet communications sent through the United States mail are inherently more difficult to trace than permissible, anonymous correspondence. The evidence suggests that the opposite is true.

In addition, Defendants primarily screen prisoner mail for content, not for the identity of the sender, so the traceability of Internet-produced information is only marginally relevant to Defendants' penological interests. For example, Pelican Bay does not require that correspondence to prisoners contain a return address. Mackay Dec., Ex. A at 39.[9] This fact suggests that the prison has no interest in tracking down those who communicate with prisoners. In fact, the only mail that is banned because of the identity of the sender is correspondence from another prisoner. 15 C.C.R. § 3133. Because prisoners do not have access to the Internet, permitting prisoners to receive Internet-produced ma-

---

**9.** Plaintiff's request that the Court take judicial notice of the transcript from this proceed-

ing is unopposed. That request is granted (Docket # 49).

**1112**

terial would not allow prisoners to circumvent this regulation.

In sum, Defendants have not satisfied the first factor of the *Turner* test because they have not articulated a rational connection between the policy at issue and a legitimate penological interest. This factor, moreover, "is the sine qua non" in determining the constitutionality of a prison regulation. *Morrison,* 261 F.3d at 901; *see also Prison Legal News,* 238 F.3d at 1151 ("Because the Department and its Officials have failed to show that the ban on standard mail is rationally related to a legitimate penological objective, we do not consider the other *Turner* factors."). Nevertheless, the other factors enumerated in *Turner* also support denying Defendants' motion for summary judgment.

### B. Alternative Means of Exercising First Amendment Rights

Plaintiff has presented undisputed evidence that certain information of particular interest to prisoners is only available on the Internet. For example, a nonprofit organization devoted to raising awareness of and preventing sexual violence in prison publishes its information only on the Internet. Declaration of Lara Stemple (Stemple Dec.) ¶¶ 2–3. Other information can be acquired in hard copy only through time-consuming and expensive effort. Declaration of Beverly Lozano (Lozano Dec.) ¶¶ 3–4.

Defendants argue that the availability of information in alternative for a is not relevant in the *Turner* analysis. Rather, Defendants contend that any information that is available only over the Internet can be transcribed or summarized and sent into Pelican Bay. Consequently, the availability of individuals willing to write down information found on the Internet provides a sufficient alternative means for prisoners to exercise their First Amendment rights.

Defendants' reliance on individual transcription is an impractical alternative to transmission of Internet-produced materials. Because Pelican Bay bans all materials downloaded from the Internet, not just e-mail, it is not reasonable to expect individuals interested in transmitting information to prisoners to copy verbatim lengthy articles, judicial decisions, and new procedural rules. With respect to graphics and photos, transcription is impossible. Moreover, summarization of information by laypeople could result in incorrect or improperly interpreted information being transmitted. Consequently, transcription and summarization of Internet-produced material is not a viable alternative to downloading and transmitting this information through the United States mail.

### C. Impact on Prison Resources

Defendants argue that the increase in the number of pages of mail that would ensue if prisoners were allowed to receive Internet-generated material would overload the mail room staff, with a consequent adverse impact on the allocation of prison resources. However, as noted above, the prohibition at issue here is an imperfect and arbitrary substitute for regulating quantity of mail. Whatever impact increased mail volume may have on prison resources cannot justify Pelican Bay's ban on materials generated from this particular source.

### D. Available Alternatives to the Challenged Policy

Evidence of an "alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interest" is evidence that the regulation is unreasonable. *Turner,* 482 U.S. at 91, 107 S.Ct. 2254. Defendants have asserted a penological interest in limiting the overall

quantity of mail sent to the prison, but have offered no evidence that they cannot impose limits on the quantity of mail received by individual prisoners either through page limitations or limitations on the number of pieces of mail. For purposes of this motion, the Court assumes that controlling mail quantity serves a valid penological purpose. A volume control policy would address Defendants' proffered concern—the increase in the total quantum of mail—without violating the First Amendment rights of prisoners to receive Internet-generated information. Consequently, the availability of this alternative policy suggests the ban on Internet-generated materials is unreasonable.

E. Defendants' Judicial and Statutory Authority

Defendants point out that the California Court of Appeal has examined the regulation at issue here and found it constitutional. *See In re Collins,* 86 Cal.App.4th 1176, 1186, 104 Cal.Rptr.2d 108 (2001). However, the *Collins* decision is not binding authority and it has no preclusive effect in this litigation because Plaintiff was not a party to that case. *See Hydranautics v. FilmTec Corp.,* 204 F.3d 880 (9th Cir. 2000).

In addition, *Collins* is distinguishable from this case in one respect. In *Collins,* the plaintiff did not present any evidence to refute the defendants' showing of a rational connection between the regulation and the asserted penological interest. 86 Cal.App.4th at 1184, 104 Cal.Rptr.2d 108. In this case, Plaintiff has submitted numerous declarations relevant to the relative anonymity of Internet-generated material, the availability of alternative sources of information provided on the Internet, and the impact of mailed Internet material on mail volume. This evidence sufficiently "refutes a common-sense connection between a legitimate objective and

a prison regulation." *Frost,* 197 F.3d at 357.

Moreover, the *Collins* court concluded that California Code of Regulations section 3133 prohibited the defendant prison from imposing limitations on the number of pieces of correspondence a prisoner may receive, or the number of pages a prisoner may receive in each piece of correspondence. *Collins,* 86 Cal.App.4th at 1186, 104 Cal.Rptr.2d 108. This regulation states that "there shall be no limitations placed upon the number of persons with whom an inmate may correspond...." On its face, this regulation says nothing about the number of pages or the quantity of separate pieces of correspondence a prisoner may receive. Because of the differing procedural posture of *Collins* and this case and because this Court does not construe C.C.R. § 3133 as prohibiting reasonable limitations on the quantity of prisoner mail, the Court declines to follow *Collins* here.

In support of the reasonableness of this regulation, Defendants also point to other States that, they contend, have addressed similar penological concerns with substantially similar regulations. Defendants contend that Arizona and Minnesota have each enacted regulations "encompassing the instant issue." Defendants' Reply at 8:12–14. The Minnesota statute relied on by Defendants states, in its entirety,

Subdivision 1. Restrictions on use of online services. No adult inmate in a state correctional facility may use or have access to any Internet service or online service, except for work, educational, and vocational purposes approved by the commissioner.

Subdivision 2. Restrictions on computer use. The commissioner shall restrict inmates' computer use to legitimate work, educational, and vocational purposes.

Subdivision 3. Monitoring of computer use. The commissioner shall monitor all computer use by inmates and perform regular inspections of computer equipment.

Minn.Stat.Ann. § 243.556. This statute regulates Minnesota prisoners' access to "any Internet service." The Arizona statute relied on by Defendants similarly regulates prisoners' "access to the internet through the use of a computer, computer system, network, communication service provider or remote computing service." Ariz.Rev.Stat. §§ 31–235, 31–242.

As noted above, California prisoners do not have access to the Internet. The regulation at issue in this motion prohibits people outside the prison from sending to the prison information published on the Internet. Because neither the Minnesota nor the Arizona statute purports to address prisoners' access to information published on the Internet, these statutes offer no support for Defendants' position that the disputed regulation is reasonable.

### F. Qualified Immunity

 Defendants argue that they are immune from liability for any First Amendment violation because the Pelican Bay policy "did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity, however, is limited to actions for damages against a government official in his individual capacity. It is not available to a government entity when an official is sued in his official capacity. *See Brandon v. Holt,* 469 U.S.

464, 472–73, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Owen v. City of Independence,* 445 U.S. 622, 651, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Nor is it available when the only relief sought is injunctive. *See American Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991). Plaintiff's First Amendment claim is brought against Defendants in their official capacity and seeks only injunctive relief.[10] Therefore, Defendants are not entitled to immunity from suit.

### V. Summary Judgment and Prospective Relief

Plaintiff did not move for summary judgment. However, a review of the record and the papers submitted by the parties shows that there are no disputes of material fact for trial. At the hearing on this motion, Defendants stated that they had no additional evidence to present in response to a contemplated motion for summary judgment from Plaintiff. Consequently, because the parties have had a full opportunity to present the issues and any evidence in support of their respective positions, the Court, on its own motion, grants Plaintiff summary judgment on his claim that Pelican Bay's refusal to allow him to receive Internet-generated material through the United States mail violates his First Amendment rights.

 Plaintiff seeks injunctive relief precluding Defendants from confiscating or returning mail containing Internet-generated material. A party is entitled to a permanent injunction if it shows actual success on the merits and the likelihood of irreparable harm. *Easyriders Freedom*

---

**10.** Plaintiff sought damages from Defendants on his Eighth Amendment claims. However, because there was no substantive Eighth Amendment violation, the Court need not determine if immunity would apply. *See Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292,

143 L.Ed.2d 399 (1999) (a court considering a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right, then proceed to determine if the right was "clearly established").

*F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir.1996); *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988). For the reasons already stated, Plaintiff has shown that the prison's policy of prohibiting Internet-produced material from being received by prisoners violates the First Amendment. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir.) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)), *amended by* 160 F.3d 541 (9th Cir.1998). Consequently, Plaintiff is entitled to permanent injunctive relief.

 Injunctive relief, in this case, must comply with the requirements of the PLRA. The PLRA states,

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A).

Plaintiff brings this action solely on his own behalf. However, he has introduced evidence that other prisoners, at other prisons, have been similarly affected by the ban on Internet-generated materials. *See* Lozano Dec ¶ 6; Declaration of Sheilah Glover (Glover Dec.) ¶ 8. The undisputed evidence shows that the violation of Plaintiff's First Amendment rights is not an "isolated violation" but rather results from "policies or practices pervading the whole system." *Armstrong v. Davis,* 275 F.3d 849, 870 (9th Cir.2001).

In this circumstance, in order to correct the violation, the Court must, at a minimum, enjoin the unconstitutional policy. Such an injunction is the "least intrusive means necessary" because a limited injunction directed only at the unconstitutional policy does not "require the continuous supervision of the court, nor do[es it] require judicial interference in the running of the prison system." *Gomez v. Vernon,* 255 F.3d 1118, 1130 (9th Cir.2001). Prohibiting Defendants from enforcing a policy of rejecting prisoner mail based solely on the fact that the mail contains information downloaded from the Internet "is not overly intrusive and unworkable and would not require for its enforcement the continuous supervision by the federal court over the conduct of state officers." *Armstrong,* 275 F.3d at 872. Rather, such an injunction is narrowly tailored to redress the violation established by Plaintiff and is therefore authorized by the PLRA. *Id.* at 870 ("The scope of injunctive relief is dictated by the extent of the violation established.") (quoting *Lewis v. Casey,* 518 U.S. 343, 359, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)); *see also Crofton v. Roe,* 170 F.3d 957 (9th Cir.1999) (affirming district court's injunction which prohibited, on First Amendment grounds, the defendant prison from enforcing a blanket ban on the receipt of gift publications).

## VI. Evidentiary Objections

 In support of their motion for summary judgment, Defendants submitted copies of three abstracts of judgments which show the crimes for which Plaintiff is currently incarcerated. Plaintiff objects to these three exhibits on the grounds that they are "irrelevant and calculated to inflame the court and prejudice it against the plaintiff." Plaintiff's Objections to Defendants' Evidence (Pl.Obj.) at 1. Defendants argue that the abstracts of judgment show Plaintiff's potential for violence and

that his violent tendencies are probative of the reasonableness of their policy prohibiting all prisoners at Pelican Bay from receiving Internet-generated · information. As discussed above, Defendants argued that Internet-generated material facilitates transmission of criminal communications. Plaintiff's criminal history may be evidence relevant to this contention. The Court does not find that this probative value "is substantially outweighed" by the danger of unfair prejudice. Fed.R.Evid. 403.

Plaintiff also objects, pursuant to Federal Rule of Evidence 705, to two paragraphs in the Declaration of Dwight Winslow. As noted above, these objections go to the weight of the evidence, not its admissibility. The Winslow Declaration is admissible in its entirety.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part (Docket # 31). Plaintiff's motion for a preliminary injunction is denied (Docket # 53). Plaintiff's objections to evidence are overruled and his request for judicial notice is granted (Docket ## 63, 49).

The Court, on its own motion, grants Plaintiff summary judgment on his First Amendment claim. By separate order, the Court will permanently enjoin Defendants from enforcing any policy prohibiting California inmates from receiving mail that contains Internet-generated information. Judgment shall enter accordingly. Each party shall bear its own costs.