[No. A090799. First Dist., Div. One. Feb. 6, 2001.]

In re AARON COLLINS on Habeas Corpus.

## COUNSEL

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Frances T. Grunder and Catherine A. McBrien, Deputy Attorneys General, for Petitioner.

Heather MacKay for Respondent.

## OPINION

**STRANKMAN, P. J.**—INMATE Classified is in the business of publishing personal Web pages on the Internet for prison inmates who subscribe to its service. Each inmate's page includes an individual electronic (e-mail) address, and INMATE Classified periodically downloads and prints any e-mail messages received by the inmate subscriber and sends them to the inmate by regular United States mail. Aaron Collins, an inmate at Pelican Bay State Prison (Pelican Bay), subscribed to INMATE Classified's service. In mid-1998, however, the warden at Pelican Bay directed that materials downloaded from the Internet would not be accepted by the prison mailroom.

Collins filed a petition for habeas corpus challenging the prohibition on First Amendment grounds, and the trial court issued an order to show cause. After an evidentiary hearing, the trial court granted the petition and ordered that inmates could receive e-mail or other Internet related material sent by United States mail, subject to existing regulations governing nonconfidential inmate mail. The warden has appealed. We conclude that the ban is valid because it is "reasonably related to legitimate penological interests." (*Turner v. Safley* (1987) 482 U.S. 78, 89 [107 S.Ct. 2254, 2261, 96 L.Ed.2d 64] (*Turner*).) Therefore we reverse the trial court's order and direct it to issue a new order denying the petition.

## Factual and Procedural Background

Pelican Bay is a maximum security prison that houses some of the state's most dangerous prisoners, including those who have become affiliated with prison gangs or committed serious disciplinary infractions in prison and are confined in its security housing unit. (See *Madrid v. Gomez* (N.D.Cal. 1995) 889 F.Supp. 1146, 1155.) Inmates at Pelican Bay do not have direct access to the Internet through computer terminals at the prison.

INMATE Classified is a business that advertises itself as offering prison inmates a "personal connection to the Internet." For a fee, INMATE Classified designs personal home pages for inmates, which are accessible through links on INMATE Classified's Web page. Each personal home page includes the inmate's prison mail address and an individual e-mail address. Prospective correspondents who want a response from the inmate are asked to include a return mail address because the inmate cannot send e-mail. Once a week INMATE Classified downloads and prints any e-mail received by an inmate and sends those messages to the inmate by regular mail.

Collins subscribed to INMATE Classified sometime in mid-1997, while he was incarcerated at California State Prison-Sacramento. He was transferred to Pelican Bay in October 1997 and continued his subscription for several months, receiving multiple messages. But in May 1998, the warden at Pelican Bay issued a memorandum informing inmates that there had been an influx of mail containing Internet-related material and that materials downloaded from the Internet and sent to the prison were considered unauthorized publications pursuant to California Code of Regulations, title 15, section 3138, subdivision (f)(1). The memorandum stated that these publications and the mail in which they were enclosed would not be accepted by the prison mailroom.

After Collins's administrative challenges to this policy were unsuccessful, he filed the petition for habeas corpus that is the subject of this appeal. At the hearing on the petition, Pelican Bay presented the testimony of Augie Lopez, associate warden of central services, Jill Tholl, prison mailroom supervisor, and Michael Menz, a detective in the Sacramento County Sheriff's Department assigned to the High Tech Crimes Task Force, who testified as an expert in Internet law enforcement and investigation. According to Lopez and Tholl, the prison mail room staff opens between 2,000 and 5,000 pieces of mail daily, Monday through Friday. In addition to being searched for contraband, mail is screened to determine whether it is "third-party-mail," i.e., mail sent through a third party to circumvent the regulation allowing correspondence between prison inmates only with prior approval of

the warden of each facility. (See Cal. Code Regs., tit. 15, § 3139.) Mail also is checked for compliance with the regulation permitting inmates to receive publications such as books, periodicals, and newspapers only from approved vendors and in limited number. (See *id.*, § 3138, subd. (f).) There is also a random screening of the content of approximately 10 percent of the mail, which may result in more intense scrutiny by security staff.[1]

Associate Warden Lopez testified that the policy prohibiting inmates from receiving Internet-generated materials by regular mail was based on security concerns and the potential for increased workload on staff. He explained that Pelican Bay has a large population of gang-oriented inmates, many of whom have tried to use the mail to accomplish drug-related crimes, smuggling, extortion, and solicitation for murder both inside and outside the prison. The existing restrictions on the flow of information into and out of the prison, such as the limitation on inmate-to-inmate communication, are aimed at impeding and curtailing criminal activity by inmates. The restrictions on published materials are also related to prison security; their purpose is to keep out coded messages, narcotics, weapons, and other contraband. Lopez believed that the quick and easy accessibility of communication by e-mail would generate an "avalanche" of mail to inmates, exacerbating security problems and resulting in an "exorbitant workload" for prison staff.

Detective Menz explained that ascertaining the source of e-mail messages can be difficult because senders can hide or disguise their identity more easily than can those who send regular mail. Menz also was of the opinion that the availability of e-mail could dramatically increase the volume of mail to inmates, particularly given the likelihood that their e-mail would include junk mail or "spam" as well as personal communications.

The witnesses at the hearing also included Donald Byrd, who had provided a written statement and who testified as a computer consultant at the court's request. Byrd acknowledged that as a practical matter, the possibility of attaching material to an e-mail message makes it easier to send an unlimited amount of information by e-mail than by regular mail. He agreed that e-mail may be somewhat less traceable than regular mail, but thought that most people were not sophisticated enough to hide their e-mail tracks. As for whether it would be easier to place a code in the text of a typed letter or an e-mail message, Byrd thought that would depend on the sender's ingenuity rather than the medium.

---

[1]Nonconfidential mail is subject to being read in its entirety or in part before it is delivered to an inmate and may be disallowed if its text "presents danger, or a threat of danger, to any person." (Cal. Code Regs., tit. 15, §§ 3135 subd. (a), 3138 subd. (a).) Inmates also are not permitted to receive mail which, in the judgment of staff, includes any matter containing or concerning various kinds of criminal activity, among other subjects. (*Id.*, §§ 3136, subd. (a), 3006, subd. (c).)

The trial court took the matter under submission and eventually requested additional briefing from the parties on suggested language for a ruling directing the Department of Corrections to adopt a policy allowing inmates to receive Internet-generated materials, subject to various restrictions. Subsequently, in October 1999, in response to a request for further information by the trial court, a declaration was filed indicating that the California Department of Corrections had begun the lengthy process of developing and formulating administrative regulations governing inmate access to e-mail. As of yet, however, no such regulation has been adopted.

In December 1999, the trial court issued the following order: "E-mail or other internet related materials may be received by inmates if sent to the inmate via U.S. Mail. All internet related material received by way of U.S. Mail shall be treated as non-confidential mail and shall be governed by the California Code of Regulations, Title 15, Article 4, § 3130 et seq." The warden has appealed from the order.

DISCUSSION

## A. Standard of Review

This court applies the substantial evidence test to the trial court's resolution of pure questions of fact and independently reviews questions of law, such as the selection of the controlling rule. With respect to mixed questions of law and fact, this court reviews the trial court's application of law to fact under a deferential clearly erroneous standard if the inquiry is predominantly factual. But when the application of law to fact is predominantly legal, such as when it implicates constitutional rights and the exercise of judgment about the values underlying legal principles, this court's review is de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *Smith v. Fresno Irrigation Dist.* (1999) 72 Cal.App.4th 147, 156-157 [84 Cal.Rptr.2d 775]; see generally *People v. Louis* (1986) 42 Cal.3d 969, 985-987 [232 Cal.Rptr. 110, 728 P.2d 180].) These basic principles of appellate review apply to an appeal from an order granting a petition for habeas corpus after an evidentiary hearing. (*In re Pratt* (1999) 69 Cal.App.4th 1294, 1314 [82 Cal.Rptr.2d 260].) This appeal involves a constitutional challenge to the facial validity of a prison policy, and its resolution requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests. Accordingly, de novo review is appropriate.

## B. Applicable Legal Principles

Although the precise issue in this appeal is one of first impression, the principles governing our analysis are well settled. The United States Supreme Court has acknowledged that prison walls neither separate inmates

from the protections of the Constitution nor bar free citizens from exercising their own constitutional rights by reaching out to those inside prison. (*Thornburgh v. Abbott* (1989) 490 U.S. 401, 407 [109 S.Ct. 1874, 1878-1879, 104 L.Ed.2d 459] (*Thornburgh*).) The Supreme Court has also emphasized, however, that courts are ill equipped to deal with the complex and difficult problems of prison administration and reform, which are not readily susceptible to resolution by court decree. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." (*Turner, supra*, 482 U.S. at pp. 84-85 [107 S.Ct. at p. 2259].)

The Supreme Court has remarked on the need for particular sensitivity to "the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word," such as lawyers, journalists, and families and friends of prisoners. (*Thornburgh, supra*, 490 U.S. at p. 407 [109 S.Ct. at p. 1878].) While such claims to prison access undoubtedly are legitimate, prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. The acknowledged expertise of prison officials and the limitations of the judiciary with respect to the problems of prison management have led the Supreme Court to afford "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." (*Id.* at pp. 407-408 [109 S.Ct. at p. 1879].)

In *Turner, supra*, 482 U.S. 78, the Supreme Court formulated a standard of review for prison regulations that is responsive both to the need to protect constitutional rights and to the policy of judicial restraint regarding prisoner complaints. ▮ "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." (*Id.* at pp. 85, 89 [107 S.Ct. at pp. 2259-2260, 2261].) This reasonableness standard applies whether the regulations at issue affect the First Amendment rights of prisoners or of those who seek to communicate with prisoners. (*Thornburgh, supra*, 490 U.S. at pp. 408, 410, fn. 9 [109 S.Ct. at pp. 1879, 1880].) Based on this standard, the court has concluded that a rule barring inmate-to-inmate correspondence was reasonably related to legitimate prison security interests (*Turner, supra*, at pp. 91-92 [107 S.Ct. at pp. 2262-2263]), and it has upheld the facial validity of

regulations authorizing prison officials to reject incoming publications found to be detrimental to institutional security. (*Thornburgh, supra*, at pp. 414-419 [109 S.Ct. at pp. 1882-1885].)[2]

The *Turner* court instructed that several factors are relevant in determining the reasonableness of a regulation. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." The connection cannot be so remote as to render the policy arbitrary or irrational, and the governmental objective must be legitimate and neutral. (*Turner, supra*, 482 U.S. at pp. 89-90 [107 S.Ct. at p. 2262].) The second factor is whether alternative means of exercising the right remain open to prison inmates. "Where 'other avenues' remain available for the exercise of the asserted right [citation], courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' [Citation.]" (*Id.* at p. 90 [107 S.Ct. at p. 2262].)

A third factor is the impact that accommodation of the right at issue will have on guards and other inmates and on the allocation of prison resources generally. "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. [Citation.]" (*Turner, supra*, 482 U.S. at p. 90 [107 S.Ct. at p. 2262].)

Finally, the absence of ready alternatives to the regulation is evidence of its reasonableness. Conversely, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable but is an exaggerated response to prison concerns. The *Turner* court cautioned, however, that it was not articulating a "least restrictive alternative" test. "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. [Citation.] But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological

---

[2]The *Turner* court also held that a rule effectively establishing an almost complete ban on marriage by an inmate was facially invalid because it was an exaggerated response not reasonably related to legitimate penological objectives. (*Turner, supra*, 482 U.S. at pp. 95-99 [107 S.Ct. at pp. 2265-2267].) Although the *Thornburgh* court concluded that the regulations regarding publications were facially valid, it also remanded the matter for an examination of their validity as applied to a number of publications specifically excluded by the prison officials. (*Thornburgh, supra*, 490 U.S. at pp. 404, 419 [109 S.Ct. at pp. 1876-1877, 1884-1885].)

interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." (*Turner, supra,* 482 U.S. at pp. 90-91 [107 S.Ct. at p. 2262], italics omitted.)

Two recent Ninth Circuit Court of Appeals opinions which have applied the *Turner* test, *Mauro v. Arpaio* (9th Cir. 1999) 188 F.3d 1054, and *Frost v. Symington* (9th Cir. 1999) 197 F.3d 348, also inform our analysis. In *Mauro,* an en banc opinion, the court upheld a policy prohibiting prisoners from possessing sexually explicit materials, defined as photographs, drawings, magazines, and pictorials showing frontal nudity. The court concluded that the policy was rationally related to the jail's stated and legitimate objectives of maintaining security, rehabilitating inmates, and reducing sexual harassment of female detention officers. (*Mauro, supra,* at p. 1059.) The court emphasized that to show such a relationship, prison officials were not required to prove that the banned material actually caused problems in the past or were likely to cause problems in the future. Nor was it significant whether the court agreed with the policy or whether it in fact would advance the jail's legitimate interests. The only question was whether the judgment of prison officials was rational, that is, whether they might reasonably or plausibly have thought that the policy would advance those interests. (*Id.* at p. 1060.)

In *Frost v. Symington, supra,* 197 F.3d 348, the court upheld a regulation banning sexually explicit magazines depicting sexual penetration that were excluded in part to protect female officers from abuse and harassment. (*Id.* at pp. 357-358.) As part of its analysis, the *Frost* court articulated a refinement of the first prong of the *Turner* test. It held that when the inmate presents sufficient evidence that "refutes a common-sense connection between a legitimate objective and a prison regulation," the state must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational. But when the inmate does not present such evidence and the governmental objective is neutral and legitimate, *Turner*'s first prong is satisfied. (*Frost, supra,* at p. 357.)

C. *Analysis*

 We begin by considering whether the objective underlying the disputed policy is legitimate and neutral and whether the policy is logically or rationally related to that objective. (*Turner, supra,* 482 U.S. at pp. 89-90 [107 S.Ct. at pp. 2261-2262].)

Warden Lopez testified that the policy was prompted by prison security concerns, and the legitimacy of that security goal is beyond question. (See

*Thornburgh, supra,* 490 U.S. at p. 412 [109 S.Ct. at p. 1881] [protecting prison security is central to all other corrections goals].) The policy operates in a neutral fashion, banning all Internet-generated regular mail without regard to content. Furthermore, it was undisputed that prison officials believed the potential high volume of e-mail, the relative anonymity of the senders, and the ability of senders to easily send or attach lengthy articles and other publications would greatly increase the risk that prohibited criminal communications would enter the prison undetected and would make tracing their source more difficult. Prison officials were not required to prove that the banned material would actually cause or were likely to cause such problems, and the question is not whether their judgment was in fact correct, but whether it was rational. (*Mauro v. Arpaio, supra,* 188 F.3d at p. 1060.) We conclude that given the unique characteristics of e-mail, the ban on receipt by regular mail of Internet-generated material was neither arbitrary nor irrational and was logically related to the prison's legitimate security concerns. Collins presented no evidence to refute this connection. (*Frost v. Symington, supra,* 197 F.3d at pp. 356-357.)

The next question is whether alternative means of exercising the right at issue remain open. (*Turner, supra,* 482 U.S. at p. 90 [107 S.Ct. at p. 2262].) The policy in dispute here is far less restrictive than the rule upheld in *Turner,* which precluded all communication between certain individuals. The policy on e-mail does not prevent a Pelican Bay inmate from communicating either with people in general or with anyone in particular. A Pelican Bay inmate may still express himself by means of an INMATE Classified home page. Each such page includes the inmate's regular mail address, enabling anyone who wants to write to the inmate to do so, and the ban has no effect at all on the inmate's ability to respond to a letter. As we gauge the validity of the prison's policy, the undisputed availability of this alternative method of communication with exactly the same group as might respond by e-mail weighs heavily in favor of according judicial deference to the informed discretion of the prison administrators.

The evidence was also uncontradicted that there is currently a one-day backlog in distributing the mail, that the mail room is understaffed by six persons, and that an increase in the volume of the mail or difference in the nature of the screening process could severely delay the distribution of mail to inmates. This evidence of the potential impact accommodation of the asserted right to receive e-mail by regular mail could have on other inmates and on the allocation of prison resources also supports the conclusion that judicial deference to prison officials is warranted. (*Turner, supra,* 482 U.S. at p. 90 [107 S.Ct. at p. 2262].)

Finally, Collins has not demonstrated that there are obvious, easy alternatives to the policy that would accommodate the rights at issue at de minimis

cost to the prison's legitimate security interests. (*Turner, supra,* 482 U.S. at p. 91 [107 S.Ct. at pp. 2262-2263].) Collins theorizes that the existing system for opening and inspecting regular mail and restricting "publications" can easily be adapted to mailed Internet materials, and apparently the trial court agreed. But that theory disregards the judgment of prison officials that the substantial increase in the volume of regular mail likely to result from allowing such materials, coupled with the unique characteristics of e-mail, could drastically undermine the effectiveness of any existing screening procedures and greatly increase the risk of missing dangerous messages. That risk, together with the potential burden on staff resources from attempting to apply existing procedures to Internet-generated materials, supports a conclusion that those procedures are not an adequate alternative to the ban.

The trial court itself posed the possibility that security concerns could be satisfied by a numerical limitation on the volume of e-mail related correspondence an inmate could receive. As the warden points out, however, current regulations provide that except for correspondence between inmates and former inmates, "there shall be no limitations placed upon the number of persons with whom an inmate may correspond . . . ." (Cal. Code Regs., tit. 15, § 3133.) Accordingly, until the regulations are amended or new regulations are adopted, the court's suggestion was not a viable alternative.

To summarize, we conclude that the policy at issue is reasonably related to legitimate prison security interests at Pelican Bay and is facially valid.[3] Therefore we reverse the trial court's order and remand with directions to enter an order denying the petition for habeas corpus.

Stein, J., and Swager, J., concurred.

A petition for a rehearing was denied March 8, 2001, and petitioner's petition for review by the Supreme Court was denied May 23, 2001. Mosk, J., was of the opinion that the petition should be granted.

---

[3]We express no opinion on whether a similar policy at a different state prison or at all state prisons would pass muster under *Turner, supra,* 482 U.S. 78.