125 Cal.Rptr.2d 458 (2002)
102 Cal.App.4th 95
In re John E. DANNENBERG, on Habeas Corpus.
No. A095299.
Court of Appeal, First District, Division Three.
September 19, 2002.
Rehearing Denied October 10, 2002.
Review Granted January 15, 2003.
*461 Bill Lockyer, Attorney General for the State of California; Robert R. Anderson, Chief Assistant Attorney General; Paul D. Gifford, Senior Assistant Attorney General; Susan Duncan Lee, Supervising Deputy Attorney General; Matthew D. Mandelbaum, Deputy Attorney General, Counsel for Appellant.
Matthew Zwerling, Executive Director; Kathleen Kahn, Staff Attorney, First District Appellate Project, Counsel for Respondent.
PARRILLI, J.
John E. Dannenberg sought a writ of habeas corpus in the trial court, claiming the Board of Prison Terms (the Board) had illegally denied him parole after a hearing on August 17, 1999. The court issued an order to show cause, held a hearing, and ordered the Board to hold another parole suitability hearing within 30 days. The court directed the Board to set a parole date no later than February 15, 1998, unless there were changed circumstances since the latest parole hearing.
Respondents Dave Hepburn, chairman of the Board, and J.S. Woodford, warden of San Quentin State Prison, have appealed.[1] We have stayed the trial court's order. *462 We agree with the trial court that writ relief was appropriate. However, based on developments in case law after the court's ruling, we hold that the Board must be allowed an opportunity to redetermine the merits of Dannenberg's parole application in the first instance, under the proper legal standards.

BACKGROUND

1. The Commitment Offense

The trial court summarized the facts of Dannenberg's offense as follows, based on the probation report:[2]
"By May, 1985, Dannenberg and his wife, victim Linda Dannenberg [footnote omitted] had been undergoing severe domestic difficulties for a number of years. They had been engaged in marriage counseling and the victim had also sought individual psychiatric assistance.
"Apparently the victim was planning a dissolution of marriage and a physical separation, although there is no evidence that Dannenberg knew that.
"The marriage had been marred by verbal discord and at least one physical [footnote omitted] altercation (involving the victim and the minor child of [Dannenberg] and the victim) in the past.
"On the morning of May 5, 1985, Dannenberg awakened the parties' five year old son. He noticed that the child had wet his bed, so he went into the bathroom to draw a bath for the boy. The tub drain was clogged, and the toilet was running. [Dannenberg] obtained tools (a pipe wrench and a screwdriver) from a nearby pantry and in the process chastised the victim for failing to clean the tub properly (apparently he blamed her for the clogged condition of the drain).
"The victim followed Dannenberg into the bathroom. Dannenberg states that the victim picked up the screwdriver and came toward him, jabbing the screwdriver at him. Dannenberg had defensive wounds on his body. The victim attacked [Dannenberg], clawing and scratching his left arm with her fingernails, and cutting his arm with the screwdriver. She told Dannenberg that she wanted him dead. Dannenberg picked up the pipe wrench and hit the victim once on the side of the head. The victim kept coming at Dannenberg, who hit her a couple more times on the head.
"The victim fell down, but kept kicking Dannenberg, who claims that he lost consciousness and that when he came to he found the victim lying motionless on the side of the bathtub, with her head partially under the water of the half-filled tub.
"Dannenberg called 911 and reported the incident.
"The autopsy revealed that the victim had been hit on numerous occasions on the head but that the cause of her death was drowning.
"..........................
"Dannenberg was charged with first and second degree murder (Penal Code § 187). In 1986 a jury acquitted him of first degree murder and convicted him of second degree murder. He was sentenced, in September, 1986, to fifteen years to life in state prison."

2. The Staff Reports

The evaluation report prepared by San Quentin staff in advance of Dannenberg's *463 August 1999 parole hearing incorporated the aggravating and mitigating circumstances stated in a 1994 report. The aggravating circumstances were his wife's vulnerability due to her smaller size and Dannenberg's use of a weapon, which indirectly led to his wife's death. The mitigating circumstances were Dannenberg's lack of any prior record; his gainful employment for over 20 years, college education, family ties, and financial stability (he was an electrical engineer who was CEO of his own company at the time of the crime); the fact that the crime occurred after great provocation occasioned by the victim's "surprise physical attack"; Dannenberg's voluntary acknowledgment of wrongdoing at an early stage; and the fact that his wife appeared to be the initiator and aggressor in the incident.
The report noted that Dannenberg had complied with the directives issued by the Board at his prior parole consideration hearing, which were to remain discipline-free and participate in therapy. He had continued to receive exceptional job performance evaluations from his supervisor in the San Quentin Library, and he participated in the prison's Educational Advisory Committee. He planned to live with his son's foster parents if released, and would start a business in water conservation or electronics. Considering Dannenberg's commitment offense, his lack of a prior record, and his "continued exceptional institutional programming" (Dannenberg had no disciplinary reports since becoming an inmate), the author of the report concluded that "Dannenberg would pose a low threat to the public at this time, if released from prison."
A 1999 Psychosocial Assessment of Dannenberg described him as "intellectually bright, cooperative, friendly and extremely forthright throughout the clinical interview." He "exhibited no signs or symptoms of any mental disorder. His criminal behavior is probably a consequence of one time los[s] of impulse control combined with fear of his wife's rage and the weapon (screwdriver) she was attacking him with, as he has claimed. Such a violent act on the part of Mr. Dannenberg is not viewed by the examiner as likely to occur again. Mr. Dannenberg has remained disciplinary free throughout his incarceration and essentially behaved as a model prisoner. His violence potential can be considered below average when compared to the average inmate at San Quentin State Prison." The psychologist agreed with previous examiners that Dannenberg had "no psychiatric or emotional impairments," and that his crime was the result of unique situational factors. Dannenberg had gained insight into his psychological dynamics by participating in therapy and self-help groups in prison. According to the psychologist, "Mr. Dannenberg's release date and the timing and conditions of his parole can be determined and based on other than psychiatric considerations."

3. The August 1999 Parole Hearing

Dannenberg represented himself at his August 1999 parole hearing. The Presiding Commissioner made it clear that Dannenberg was not required to discuss his offense with the Board or admit to it, and that the Board was not going to retry the case but did need to understand the facts. Dannenberg willingly explained his version of the events leading to his wife's death. He explained that there was blood on the underside of the bathtub spout, and the defense theory at trial had been that his wife had tried to wash herself, but somehow "jerked her head up and hit her head on the spout and then went down again and drowned." He said there was expert testimony that he could not have picked his wife up and put her in the tub without smearing the blood that was found on the *464 bathroom floor. Dannenberg also said he had always "had a problem with" his second degree murder conviction, because he never intended to harm his wife, though he did feel he had caused her death.
A deputy district attorney asked the Board to deny Dannenberg a parole date, contending that Dannenberg's version of the facts was inaccurate. The deputy district attorney claimed that Dannenberg's defensive wounds were minor, his domestic difficulties had been severe, the psychiatric reports in the file were questionable, and Dannenberg's persistence in maintaining his version of the facts indicated that "he could have the same kind of problem if you release him again."
The Board stated its decision as follows: "The Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison: And the primary reason is the commitment offense itself. The offense was carried out in an especially cruel or callous manner, and the Board also finds the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was inexplicable or very trivial in relation to the offense. We rely partially on the autopsy report which indicated that the victim was repeatedly struck in the head, and at some point the victim pushed or fellwas pushed or fell into the bathtub full of water and the eventual cause of death was drowning. Mr. Dannenberg has no previous record. His behavior while he's been in the institution has been commendable. There are no psychiatric factors to consider. He has viable parole plans. In response to P.C. 3042 notices, Deputy District Attorney Braughton from Santa Clara County was here to oppose any consideration of parole. The Panel makes the following findings: The prisoner needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others. Nevertheless, the prisoner should be commended for remaining discipline-free, for programming well. However, these positive aspects of his behavior do not outweigh the factors of unsuitability."
The Board decided to wait for two years before holding another suitability hearing, stating its reasons for this determination separately. The Board found it unreasonable to expect that parole would be granted sooner than two years, for the following reasons: "The prisoner committed the offense in an especially cruel manner. The victim, Mr. Dannenberg's wife, was struck repeatedly in the head. She bled extensively in the bathroom in the family home and eventually drown[ed] in a bathtub full of water. In addition, the prisoner has not completed the necessary programming which is essential to his or her adjustment and needs additional time to gain such programming. And in the Board's opinion, Mr. Dannenberg needs to accept full responsibility for the crime that he committed and discontinue his attempts to minimize his responsibility for that. The Panel recommends that the prisoner remain disciplinary-free, if available participate in self-help and therapy programming."

4. The Trial Court's Ruling

Applying the standard of review announced in In re Powell (1988) 45 Cal.3d 894, 904, 248 Cal.Rptr. 431, 755 P.2d 881, and followed in In re Rosenkrantz (2000) 80 Cal.App.4th 409, 423-124, 95 Cal. Rptr.2d 279 (Rosenkrantz), the trial court *465 looked for "some evidence" to support the Board's determination.[3] The court noted that Penal Code section 3041[4] requires the Board to "normally" set a parole release date, unless the gravity of the inmate's offense, or the timing and gravity of the current or past convictions, is such that consideration of public safety requires a longer period of incarceration.
The Board conceded that its denial of a parole date was based solely on two considerations: the commitment offense, and the Board's finding that Dannenberg needed more therapy. Regarding the commitment offense, the court cited Rosenkrantz, supra, 80 Cal.App.4th at p. 425, 95 Cal. Rptr.2d 279, for the proposition that all second degree murders necessarily involve disregard for human life and suffering, and therefore a finding that the offense was committed in an exceptionally cruel and callous manner can never be a sufficient reason for denying parole. The crime of second degree murder is abhorrent, but it is an offense for which parole is available under the Penal Code, observed the court. Relying on the nature of the offense to deny parole might also constitute an impermissible "dual use" of an element of the crime to aggravate punishment, added the court.
The court further ruled that the Board could not rely on Dannenberg's refusal to accept full responsibility for his crime without violating section 5011, subdivision (b), which prohibits requiring an admission of guilt to the commitment offense as a condition of setting a parole date. As to the Board's finding that Dannenberg's motive for killing was inexplicable or trivial, the court found no supporting evidence. Overwhelming evidence suggested that the crime was an impulsive reaction by Dannenberg to his wife's attack.
Next, the court deemed the Board's finding that Dannenberg needed more therapy to be "entirely without foundation in the record." Psychological evaluations prepared for the Board in 1989, 1992, 1994, 1995, 1996, 1997, and 1999 uniformly concluded that Dannenberg showed no psychopathology and should not be denied parole on psychological grounds.
Having determined that no evidence supported the Board's denial of a parole date, the court proceeded to evaluate the evidence in support of Dannenberg's application, and concluded that he was "a nearly perfect example of an inmate who has paid his debt to society and is eligible for parole." The court recognized that the circumstances of a commitment offense can outweigh an exemplary record of prison conduct, but decided the nature of Dannenberg's offense did not suggest any threat to public safety. It was not permissible to consider the killing to have been deliberate, since the jury had acquitted Dannenberg of first degree murder.
The court noted the testimony from a former chairman of the Board, who claimed the Board followed an unwritten policy against releasing any life term inmate *466 on parole. The court made no finding on this point, however. Concluding that the Board's regulations called for a parole date no later than February 15, 1998, the court ordered the Board to hold another hearing and grant Dannenberg a parole date in accordance with the court's findings, unless there were changed circumstances.

DISCUSSION
We independently review the trial court's rulings on questions of law, and on predominantly legal mixed questions of law and fact. (In re Collins (2001) 86 Cal.App.4th 1176, 1181, 104 Cal.Rptr.2d 108.) The trial court's application of the "some evidence" standard was a legal determination, and thus our review is de novo. (Cf. Western States Petroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 573, 38 Cal.Rptr.2d 139, 888 P.2d 1268; National Parks & Conservation Assn. v. County of Riverside (1999) 71 Cal.App.4th 1341, 1352, 84 Cal.Rptr.2d 563.)[5]
The Board contends its denial of a parole date to Dannenberg must be upheld under the standard stated in Ramirez: "Judicial oversight must be extensive enough to protect the limited right of parole applicants `to be free from an arbitrary parole decision ... and to something more than mere pro forma consideration.' [Citation.] The courts may properly determine whether the Board's handling of parole applications is consistent with the parole policies established by the Legislature. [Citation.] While courts must give great weight to the Board's interpretation of the parole statutes and regulations, final responsibility for interpreting the law rests with the courts. [Citation.] Courts must not second-guess the Board's evidentiary findings. [Citation.] However, it is the proper function of judicial review to ensure that the Board has honored in a `practical sense' the applicant's right to `due consideration.' [Citation.] This function is best served by examining the Board's parole suitability rulings under a deferential abuse of discretion standard. The Board's decision should not be disturbed unless it has acted arbitrarily or capriciously. Particular deference must be accorded to the Board's factual determinations, which need only be supported by some evidence." (Ramirez, supra, 94 Cal. App.4th at p. 564, 114 Cal.Rptr.2d 381.)[6]

*467 1. The Requirements of Section 3041

Before we examine the particulars of Dannenberg's case, we consider the Board's arguments on the interpretation of the governing statute. The Board asks us to reconsider the statutory analysis set out in Ramirez.
The relevant provisions of section 3041 are those applied by the trial court in its ruling. A year before an inmate's minimum eligible parole release date, the Board "shall again meet with the inmate and shall normally set a parole release date.... The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates ...." (§ 3041, subd. (a).) The Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (§ 3041, subd. (b).)
In Ramirez, we advised the Board to consider the minimum term of an indeterminate sentence, and any concurrent determinate terms, when weighing the gravity of a commitment offense at a parole suitability hearing. We reasoned that the Board must make its suitability determination in a manner consistent with its obligation under section 3041, subdivision (a) to provide uniform terms for similar offenses. Thus, while the gravity of the commitment offense may be a sufficient basis for refusing to set a parole date under the exception provided in section 3041, subdivision (b), the exception properly applies only to particularly egregious offenses. Otherwise, the exception would tend to swallow the rule that a parole release date is "normally" set under section 3041, subdivision (a), even for murderers. Accordingly, the Board must weigh the gravity of the inmate's criminal conduct against other instances of the same crime, performing an evaluation similar to that prescribed by the sentencing rules governing probation determinations. (Ramirez, supra, 94 Cal.App.4th at pp. 569-570,114 Cal.Rptr.2d 381.)
The Board claims this reading of section 3041 puts the uniformity cart before the suitability horse. According to the Board, the provisions of section 3041, subdivision (a) come into play only after the Board has found an inmate suitable for parole under section 3041, subdivision (b). The Board concedes that uniformity in term-setting is required, but argues that proportionality is not mandated by its regulations. The Board further insists that proportionality is an impractical objective due to the very indeterminacy of the terms for murder prescribed by statute, and the necessity for each parole candidate to receive "individualized consideration." The Board suggests that since section 190 was amended by initiative measure to provide indeterminate *468 terms, "life generally cannot be considered a disproportionate term for murder."
The Board believes we fundamentally misconstrued the rules governing parole when we directed it to weigh an inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime. (Ramirez, supra, 94 Cal. App.4th at p. 570, 114 Cal.Rptr.2d 381.) The Board contends it would be irresponsible to take this approach to determine whether an inmate poses a threat to public safety, and would contravene the Board's duty to give "individualized, rather than statistically generalized, parole consideration to each prisoner." Furthermore, says the Board, our interpretation ignores its responsibility to consider other factors such as uncharged misconduct and past criminal history.
We are not persuaded. For prisoners sentenced to indeterminate terms, the Legislature has commanded the Board to "normally set a parole release date ... in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public ...." (§ 3041, subd. (a).) By demanding uniform terms for similar offenses, the Legislature has unmistakably incorporated the concept of proportionality into the parole evaluation process.[7] In its briefing the Board frequently quotes section 3041, but omits any mention of the directive that a release date is "normally" to be set. At oral argument, the Board contended the statute may be read to mean that a release date is "normally set" only after an inmate is found suitable for parole under section 3041, subdivision (b). This attempt to defer the mandate of section 3041, subdivision (a) by giving superseding effect to the exception provided in subdivision (b) violates the Legislature's clearly expressed intent.
Section 3041, subdivision (b) states that the "board shall set a [parole] release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Thus, if the Board finds an inmate suitable for receiving a parole date, a date is mandatory, not merely "normal." Furthermore, there is no reason to believe the Legislature used the term "gravity" in subdivision (b) in any different sense than in subdivision (a), which prescribes "uniform terms for offenses of similar gravity." Logically, an offense must be especially grave compared to other offenses for the exception provided in subdivision (b) to apply. The Board must use only the gravest offenses as grounds for refusing to set a parole release date, if it is to fulfill its obligation to normally set release dates so as to provide uniform terms for similar offenses.
For this reason, we respectfully disagree with the suggestion in Rosenkrantz, supra, which the trial court followed in this case, that the exceptionally cruel or callous nature of a crime can never justify a finding of unsuitability for parole because "it would necessarily apply to every second degree murder." (Rosenkrantz, supra, 80 Cal.App.4th at p. 425, 95 Cal.Rptr.2d 279.) Some murders are more cruel or callous than others, and it is the Board's duty to distinguish among them *469 when weighing the gravity of an offense to determine an inmate's suitability for parole.
As part of the weighing process, the Board should also consider the minimum term prescribed by law for the offense. We reject the Board's argument that the amendment of section 190 to provide indeterminate sentences relieved it of any duty to consider whether a life sentence for murder might be disproportionate. Such an approach "would destroy the proportionality contemplated by [ ] section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. ([] § 190 et seq.)" (Ramirez, supra, 94 Cal. App.4th at p. 570, 114 Cal.Rptr.2d 381.) The Board is not bound in any sense by the minimum term. The particular facts of many cases will justify departures of various degrees from the minimum term. However, the minimum term does embody a legislative determination of proportionality, and should be weighed as one factor by the Board in order to further the policy of meting out proportional, uniform punishment for crime. (Ramirez, supra, 94 Cal. App.4th at p. 569, and fn. 8, 114 Cal. Rptr.2d 381.)
We also reject the Board's claims that it would be impractical for it to weigh the gravity of the commitment offense against other instances of the same crime, and that this process would interfere somehow with the particularized, individual consideration the Board must give to each case. The Board's regulations provide a detailed matrix of various factors for determining the appropriate term for murders. (Cal.Code Regs, tit. 15, § 2403 et seq.) The Board must necessarily pay close attention to the particular facts of each case when it applies these regulations. Because it routinely considers the facts of inmates' offenses at parole hearings, the Board is uniquely well suited to evaluate the gravity of an inmate's offense with reference to the range of other offenses. The Board is not required to perform mechanical, statistical comparisons, but to seek "at least a rough balance between the gravity of the offenses, the time the inmate has served, and the sentences prescribed by law for the commitment offenses." (Ramirez, supra, 94 Cal.App.4th at p. 569, 114 Cal.Rptr.2d 381.)
We reaffirm the rationale articulated in Ramirez: The Legislature has made parole mandatory for a wide range of violent felons, and "normal" for murderers and others sentenced to indeterminate terms. When considering whether an inmate serving an indeterminate term is suitable for parole, the Board may not ignore the requirement that it strive to achieve uniform terms for offenses of similar gravity, and instead consider each inmate's offense in a cocoon of "individualized consideration." It must weigh the gravity of the inmate's offense against the gravity of other offenses of the same class, and take into account the term to which the inmate was sentenced. Only particularly egregious offenses will justify the denial of a parole date. (Ramirez, supra, 94 Cal.App.4th at p. 570, 114 Cal.Rptr.2d 381.)[8]
*470 The Board's reading of section 3041 would subvert the fundamental purpose of the sentencing reforms enacted by the Determinate Sentencing Law, which was to punish crime by imposing "terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." (§ 1170, subd. (a); People v. Martin (1986) 42 Cal.3d 437, 442-443, 229 Cal.Rptr. 131, 722 P.2d 905.) While section 1170 et seq. apply to determinate sentences, the current provisions of section 3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (Stats. 1976, ch. 1139, § 281, p. 5151; In re Stanworth (1982) 33 Cal.3d 176, 182, 187 Cal.Rptr. 783, 654 P.2d 1311.) Our Supreme Court has made it clear that the "uniform terms" called for by section 3041, subdivision (a) are analytically equivalent to determinate sentences imposed under section 1170 et seq. (People v. Jefferson, supra, 21 Cal.4th 86, 95-96, 86 Cal.Rptr.2d 893, 980 P.2d 441.)
We note that when the Indeterminate Sentencing Law was in effect the Adult Authority exercised more unfettered discretion over a wider range of sentences than the Board now enjoys (see Ramirez, supra, 94 Cal.App.4th at p. 560, 114 Cal. Rptr.2d 381), yet our Supreme Court strongly condemned the practice of refusing to fix a term for parole applicants. The year before the Determinate Sentencing Law was passed, the court noted: "A practice has evolved ... in which customarily a term is fixed only in conjunction with a grant of parole. [Citations.] Thus a prisoner appears before a panel of the Authority for term-fixing only when his application for parole is considered, and as a general rule if he is denied parole no further consideration is given to the determination of his term." (In re Rodriguez (1975) 14 Cal.3d 639, 646, 122 Cal.Rptr. 552, 537 P.2d 384.)
The Rodriguez court declared, "[t]he Indeterminate Sentence Law is not now being administered in a manner which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability [citation], or, that their terms will be fixed with sufficient promptness to permit any requested review of their proportionality to be accomplished before the affected individuals have been imprisoned beyond the constitutionally permitted term." (Id. at p. 650, 122 Cal.Rptr. 552, 537 P.2d 384.) This state of affairs "irrefragably demonstrat[ed] the error of the asserted assumption that the Indeterminate Sentencing Law has operated constitutionally with respect to term-fixing since its inception." (Ibid.)
Here, the trial court refrained from making a finding on whether the Board is following a policy of denying parole to all life term inmates. We also pass no judgment on that question. Clearly, however, the Board's reading of section 3041 would permit it to repeatedly refuse to set release dates, indefinitely avoiding its duty to fix uniform terms. This strained interpretation of the statute opens the door to abuses similar to the practice criticized by the Rodriguez court. If the Board disagrees with the parole policy established by law, it is free to take its grievance to the Legislature and lobby for a statutory amendment. It is not free to ignore the plain meaning of the statute.

*471 2. Dannenberg's Case

The Board's briefing makes it clear that the Board did not consider Dannenberg's suitability for parole in the manner required by section 3041. The Board makes no attempt to justify its decision with reference to the gravity of Dannenberg's crime as compared with other second degree murders, or the proportionality of the term he has served. Thus, the denial of a parole release date for Dannenberg "was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it. [Citations.]" (Ramirez, supra, 94 Cal.App.4th at p. 571, 114 Cal.Rptr.2d 381.) Furthermore, as in Ramirez, the Board points to no evidence supporting the other ground on which it denied Dannenberg a release date, which was that he needed therapy in order not to be a threat to public safety. Such a finding, applied to an inmate whose psychological assessments by prison staff are unremittingly positive, does not inspire judicial confidence that the Board has given a parole application "something more than mere pro forma consideration." (In re Sturm (1974) 11 Cal.3d 258, 268, 113 Cal.Rptr. 361, 521 P.2d 97; Ramirez, supra, 94 Cal.App.4th at pp. 564, 571, 114 Cal.Rptr.2d 381.) The trial court properly found that the Board failed the "some evidence" test on this score.[9]
As we have noted above, however, the trial court erred in its analysis of the Board's primary reason for denying parole, which was the nature of Dannenberg's offense. Section 3041, subdivision (b) requires the Board to consider the gravity of the commitment offense. Therefore, the cruelty and callousness of the crime cannot be excluded from the Board's evaluation simply because all murders are committed with malice. The court also erred by proceeding to reweigh the evidence and direct a particular result, instead of giving the Board an opportunity to exercise its discretion properly. We recognize that both these errors were based squarely on the only controlling case available to the court when it ruled, which was Rosenkrantz, supra, 80 Cal.App.4th 409, 95 Cal.Rptr.2d 279. We cannot fault the trial court for failing to foresee that our decision in Ramirez would dictate a different approach.
During oral argument, Dannenberg's counsel asked us to provide guidance to the trial court regarding the proper remedy in future habeas corpus hearings. Counsel informed us that the Board has continued to automatically deny her client a parole date in subsequent hearings. However, we can only act based on the record before us. Mindful of our judicial role and the very broad discretion vested in the Board over parole *472 decisions, we will give the Board every reasonable opportunity to follow the law as written by the Legislature and interpreted by the courts. In cases heard by the Board before Ramirez was published, courts hearing habeas corpus challenges to parole release date denials should routinely order the Board to hold another hearing consistent with the standards discussed in Ramirez, so that the Board may have "every opportunity to lawfully exercise its discretion." (Ramirez, supra, 94 Cal.App.4th at p. 572, 114 Cal.Rptr.2d 381.)
We must leave it to the trial courts, in the first instance, to decide how to respond if the Board should fail to abide by the dictates of section 3041, Ramirez, and subsequent case law. However, we encourage trial courts to persevere in their proper judicial function of ensuring that the Board honors, in a practical sense, the right of prisoners to due consideration of their parole applications. (In re Sturm, supra, 11 Cal.3d at p. 268, 113 Cal.Rptr. 361, 521 P.2d 97; Ramirez, supra, 94 Cal.App.4th at p. 564,114 Cal.Rptr.2d 381.) We do not envision a bureaucratic perpetuum of habeas petitions followed by new hearings, and will presume the Board is following the law as explained by the courts until we review a record demonstrating otherwise.
For the benefit of the trial court and the parties, we briefly discuss the other grounds the Board cited in refusing to hold another hearing for two years. The court noted that the Board's reliance on the nature of the offense to deny parole could constitute an impermissible "dual use" of facts to enhance punishment. (Cal. Rules of Court, rule 4.420(d).) The court correctly consulted the sentencing rules, which the Board must follow in setting parole release dates. (§ 3041, subd. (a); see also People v. Jefferson, supra, 21 Cal.4th 86, 96, 86 Cal.Rptr.2d 893, 980 P.2d 441 [Board fixes "term" when it sets parole release date].) However, it is well established that the particular circumstances of an offense, such as the manner of its commission, are not "elements" subject to the proscription against dual use of facts. (In re Michael L. (1985) 39 Cal.3d 81, 88, 216 Cal.Rptr. 140, 702 P.2d 222; People v. Garcia (1995) 32 Cal.App.4th 1756, 1776, 39 Cal.Rptr.2d 73; 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 257, pp. 341-342.)
The court also found that the Board violated section 5011, subdivision (b) when it declared Dannenberg "needs to accept full responsibility for the crime that he committed and discontinue his attempts to minimize his responsibility for that." Section 5011, subdivision (b) provides that the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." At oral argument, the Board claimed it required no such admission, noting that Dannenberg admitted his guilt. The Board contended it could properly base its decision on the ground that Dannenberg presented a version of the facts of his offense that the Board simply did not believe. We agree that the Board did not violate section 5011, subdivision (b) in a literal sense, because Dannenberg did not deny his guilt; his quarrels were with the prosecution's view of the facts and the theory of implied malice. Nevertheless, we do not see how Dannenberg's insistence on an account the Board found unbelievable illustrates a danger to public safety, as contemplated by section 3041, subdivision (b). The statute speaks in terms of the gravity of an inmate's current or past offenses, not his credibility before the Board. Section 5011, subdivision (b) strongly indicates that the Legislature did not view the "need to accept full responsibility for the *473 crime" as a relevant factor in setting a parole date.
There may be a case in which the inmate's version of his crime does reflect on its gravity or raise genuine concerns over the threat his release would pose to public safety. This is not that case. Dannenberg's explanation was that his wife must have gotten herself into the bathtub while he was unconscious. His version found some support in the physical evidence. The Board did not dispute his claims that there was blood on the underside of the bathtub spout, and that the pool of blood on the floor showed no track marks. The Board was free to conclude that Dannenberg had played a more active role in the murder than he was willing to admit. However, Dannenberg's refusal to concede the Board's version of the facts does not by itself make him a more dangerous prisoner.
The Board's suggestion during argument that Dannenberg might marry again and react the same way to marital stress is not only pure speculation, but also has nothing to do with Dannenberg's willingness to accept the Board's view of the facts of his offense. He might conceivably remarry and reoffend whether or not he describes his crime in terms the Board finds credible. The Board abuses its discretion when it relies on a factor having no connection with public safety to deny a parole release date. There must be a nexus between considerations of public safety and a prisoner's account of his offense if the Board is properly to base a parole decision on its disagreement with the prisoner's account.
Finally, the court ruled that no evidence supported the Board's finding that the motive for the crime was "inexplicable or very trivial in relation to the offense." The court should have refrained from second-guessing the Board on this point. The bare facts of the crime provide some supporting evidence for the Board's finding. While Dannenberg was attacked by his wife, his response with what turned out to be deadly force could reasonably be viewed as disproportionate.

DISPOSITION
The trial court's order is affirmed insofar as it granted Dannenberg's habeas corpus petition and directed the Board to promptly conduct another parole suitability hearing. The order is reversed insofar as it directed the Board to reach a particular result in the absence of changed circumstances. The court is directed to order the Board to hold another hearing as expeditiously as possible, and render a decision conforming with the following guidelines: The Board must consider the gravity and the public safety implications of Dannenberg's offense as it compares with other similar offenses, and in light of the minimum term prescribed by the Legislature for second degree murder. The Board must consider Dannenberg's psychological evaluations as a factor favoring his application for a parole date, unless a new evaluation supports a different conclusion. The Board may not continue denying Dannenberg a parole release date, without considering whether the term he is serving is disproportionate to the seriousness of his offense, and to the terms served for other similar crimes.
We concur: CORRIGAN, Acting P.J., and POLLAK, J.
NOTES
[1] The Attorney General has briefed and argued the appeal on behalf of the Board, as the party most directly affected by the challenged order.
[2] The Board, which barely mentions the facts of the offense in its briefs, raises no objection to the trial court's version of the events.
[3] The court noted that while the Board had agreed with this standard in its memorandum of points and authorities, at oral argument the Board advocated an "arbitrary and capricious" standard of review. The court deemed the two standards indistinguishable. The court's reasoning on this point anticipated with reasonable accuracy the subsequent holding of In re Ramirez (2001) 94 Cal. App.4th 549, 114 Cal.Rptr.2d 381 (Ramirez), in which we examined the Board's standard of review arguments at length and concluded that a deferential abuse of discretion standard is appropriate, one aspect of which is that the Board's factual determinations need only be supported by some evidence. (Id. at p. 564, 114 Cal.Rptr.2d 381.)
[4] Further statutory references are to the Penal Code.
[5] In Ramirez, we stated that independent review was appropriate because the trial court's review of the Board's decision on a parole application was based on a paper record. (Ramirez, supra, 94 Cal.App.4th at p. 559, 114 Cal.Rptr.2d 381.) To the extent we suggested we were free to redetermine the trial court's factual findings, we erred, though as in this case no factual determinations by the court were determinative. In re Cudjo (1999) 20 Cal.4th 673, 687-688, 85 Cal.Rptr.2d 436, 977 P.2d 66, on which we relied in Ramirez, is distinguishable because it involved review of the findings of a referee appointed by the appellate court, not findings by a trial court. (See In re Pratt (1999) 69 Cal.App.4th 1294, 1314, fn. 16, 82 Cal.Rptr.2d 260.) Whether trial court findings are based on testimonial or documentary evidence, we must accept that court's determinations on credibility and on matters of historical fact if they are supported by substantial evidence. A deferential "clearly erroneous" standard applies to predominantly factual mixed questions of law and fact. (Id. at p. 1314, 82 Cal.Rptr.2d 260; In re Collins, supra, 86 Cal.App.4th at p. 1181, 104 Cal.Rptr.2d 108; cf. Shamblin v. Brattain (1988) 44 Cal.3d 474, 479, 243 Cal.Rptr. 902, 749 P.2d 339.)
[6] The Board also claims, as it did below, that Dannenberg has no constitutionally protected liberty interest in a parole date, and therefore could claim no due process protection in connection with his parole hearing. This position is inconsistent with a long line of California Supreme Court authority. (In re Powell, supra, (1988) 45 Cal.3d at pp. 903-904, 248 Cal.Rptr. 431, 755 P.2d 881; Ramirez, supra, 94 Cal.App.4th at pp. 560-564, 114 Cal. Rptr.2d 381, citing cases.)

Another threshold contention advanced by the Board must also be rejected out of hand. The Board asserts that a challenge to the proportionality of a sentence must be raised at the time of sentencing, not after a denial of parole. However, the trial court has no discretion to impose any sentence other than the indeterminate term prescribed by statute. (§ 1168, subd. (b).) It is the Board that effectively determines the inmate's actual "term" by setting a parole release date under section 3041, subdivision (a). (People v. Jefferson (1999) 21 Cal.4th 86, 96, 86 Cal.Rptr.2d 893, 980 P.2d 441.)
[7] The Board's attempt to read its regulations to avoid the need to consider proportionality is unavailing. Regulations must be consistent with statutory requirements.(Terhune v. Superior Court (1998) 65 Cal.App.4th 864, 873, 76 Cal.Rptr.2d 841; Ramirez, supra, 94 Cal. App.4th at p. 559, 114 Cal.Rptr.2d 381.)
[8] We emphasize that our discussion in this part of the opinion, like our statutory analysis in Ramirez, concerns only the Board's consideration of the gravity of the offense as a factor in determining an inmate's suitability for parole. The statute also authorizes the Board to consider the inmate's criminal history. (§ 3041, subd. (b).) However, in both this case and Ramirez the Board made it clear that the nature of the commitment offense itself was the determinative factor in refusing to set a release date. {Ramirez, supra, 94 Cal.App.4th at p. 558, 114 Cal.Rptr.2d 381.)
[9] At oral argument, the Board cited In re Pipinos (1982) 33 Cal.3d 189, 187 Cal.Rptr. 730, 654 P.2d 1257, for the proposition that expert opinion on a prisoner's mental state is not binding on the trier of fact. Pipinos involved an application for release pending appeal. Our Supreme Court held that the trial court was free to reject the professional opinions of a psychiatrist and a criminologist regarding the ultimate question of the prisoner's dangerousness, and to rely instead on the court's own assessment of the present crime and the defendant's history. (Id. at p. 200, 187 Cal.Rptr. 730, 654 P.2d 1257.) Pipinos does not hold that the court is free to draw its own conclusion on a defendant's mental state, disregarding the only evidence on that question.

Here, the opinion of mental heath experts on Dannenberg's psychiatric condition did not prevent the Board from making its own assessment of the gravity of Dannenberg's offense or other factors bearing on the threat he posed to public safety. The Board could not, however, find that Dannenberg's need for further therapy barred his release, in the absence of any supporting evidence.